Gordon, Robert B., J.
This wrongful death action arises out of an automobile accident that occurred on the night of September 24, 2010. On that date, an automobile being driven by Jeremy S. Gardner, allegedly intoxicated at the time, struck and killed the Plaintiffs decedent, Gregory Vilidnitsky. Vilidnitsky’s estate has brought suit against C. Cote Interiors, Inc. (“Cote” or the “Company”), Gardner’s employer, and has asserted two species of tort claims against it: 1) vicarious liability for Gardner’s negligence in causing the accident and its fatal consequences; and 2) direct liability for the negligent hiring, retention, training and supervision of Gardner (and an intoxicated colleague driving with him on the night in question). Presented for decision is Defendant Cote’s Motion for Summary Judgment.
BACKGROUND
The evidence in this case is largely undisputed and, construed in the light most favorable to the non-moving Plaintiff, can be summarized as follows.
Cote employed Jeremy Gardner, Walter Smith, Ralph Black and Aaron Gaudette as carpenters. These Cote employees did not operate Company vehicles, and were not required to transport other employees as part of their regular work for Cote.
In the summer of 2010, Gardner, Smith, Black and Gaudette were assigned by Cote to work on a construction project for a retail business in Wayland, Massachusetts. Due to the fact that these laborers resided remotely in Maine and Vermont, Cote paid for them to lodge at a Motel 6 in Framingham between Monday and Thursday throughout the duration of the project. Cote’s workers drove from their homes to Wayland on Monday morning, and then back to their homes on Friday afternoon; and, during the week, these employees commuted in their own vehicles between Motel 6 and the j ob site. The carpenters were paid only for their hours actually at work, and not for time spent at the motel or in transit.
Gardner served as Cote’s project foreman on the Wayland job, and in this capacity enjoyed the use of a Company debit card. At some point in early September 2010, Cote co-owner Brent Samson suggested to *45 Gardner that he take his workers out “for a burger and a beer” dinner, as a way to convey thanks to these employees for working overtime over Labor Day weekend rather than returning home to their families. Samson informed Gardner that Cote would pay for the meal, and Gardner understood that he could spend up to $50 in total on it. Samson expected that Gardner would take his employees to a local pub in Framing-ham that they frequented (the “Sports Pub”); but Samson had never been to the establishment himself, and there was no discussion of the transportation arrangements for the dinner.[1]
Nothing in the record reflects that Samson or anyone else from Cote ever “ordered” Gardner to take his project workers out to dinner at Company expense, and Gardner was not paid for doing so beyond Cote’s covering the tab for the dinner itself. The most the evidence reasonably supports is that Gardner was encouraged (more than once) by his boss at Cote to take a few of his project carpenters out for a modest meal, as a way of expressing appreciation for these employees having gone the extra mile for the Company in their work. Attendance at the dinner by these employees was both optional and uncompensated; and, in fact, Black and Gaudette declined Gardner’s invitation to dine with him (courtesy of Cote) when such invitation was extended to them after work on September 14, 2010. On the evening in question, therefore, Gardner went to dinner with Smith alone.[2]
Smith drove Gardner to the Sports Pub in Framing-ham on the evening of September 14, 2010, and the record reflects that they spent a few hours there. The two men consumed multiple alcoholic beverages and a pizza, and left the restaurant after settling a $67 bill (paid for with the Cote debit card). Although Smith had driven to the Sports Pub in his truck, he believed he was “too drunk to drive” back and accordingly turned the vehicle’s keys over to Gardner. During the ensuing ride back to the motel, Gardner drove into a closed construction zone and struck and killed Vilidnitsky.
The evidence is undisputed that Cote did not perform criminal background checks on its carpenters, whom it hired through their labor union. Had the Company done so, it might have discovered that Gardner had a Massachusetts offense for Operating Under the Influence (OUI) in 2003, and Smith had OUI offenses in each of 1981, 1984 and 2002. It is likewise undisputed that Cote did not research these employees’ driving histories, which could have revealed that Gardner’s license was suspended in 2001 and again in 2005 (reinstated in 2006); and Smith had a record of speeding in 1987 and leaving the scene of an accident with property damage in 1990. The summary judgment record is silent as to what Cote management would have done with such information had it been in possession of same at the time Garner and Smith were initially hired.
DISCUSSION
I. STANDARD OF REVIEW
The Court will grant summary judgment when, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute of material fact and the moving party establishes that it is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); HipSaver, Inc. v. Kiel, 464 Mass. 517, 522 (2013). The moving parly may meet this burden by submitting uncontested evidence that negates an essential element of the opposing party’s case, or by demonstrating “that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case.” HipSaver, 464 Mass. at 522 (quoting Kouravacilis v. General Motors Corp., 410 Mass. 706, 716 (1991)).
II. PLAINTIFF’S VICARIOUS LIABILITY CLAMS
Plaintiff seeks in each of his three claims in this case to hold Cote vicariously liable for the alleged negligence of Gardner in driving under the influence of alcohol and thereby causing the accident which killed Vilidnitsky. Plaintiff thus rests these claims on the common-law doctrine of respondeat superior, pursuant to which an employer may be held vicariously liable for torts committed by its employee while acting within the scope of employment. Dias v. Brigham Med. Assocs., Inc., 438 Mass. 317, 319-20 (2002).
The test for whether an employee’s acts occur “within the scope of employment” for purposes of imputing respondeat superior liability in tort to the employer is well settled;
Conduct of an agent is within the scope of employment if it is of the kind he is employed to perform; if it occurs substantially within authorized time and space limits; and if it is motivated, at least in part, by a purpose to serve the employer.
Wang Laboratories v. Business Incentives, Inc., 398 Mass. 854, 859 (1986) (citations omitted). In the present case, the undisputed evidence makes clear that Gardner’s activities on the evening of September 14, 2010 were not ones occurring within the scope of employment so defined.
First, the act of driving home a fellow employee— who was too intoxicated to drive himself—at the conclusion of a dinner at a pub is plainly not conduct “of a kind [Gardner] is employed to perform” on behalf of Cote. Gardner was a carpenter hired to carry out construction work at Company job sites. He was not employed to supervise the off-duty activities of subordinate personnel, or to transport employees by any means, and he enjoyed no use of Cote vehicles in his role as project foreman. It is true that, on this particular occasion, Gardner happened to be driving Smith back to their motel following a dinner that Cote had agreed to pay for in appreciation for these employees’ hard work. But neither Cote’s payment for the evening’s victuals, nor the Company owner’s encour *46 agement that such a dinner occur, will suffice to convert uncompensated travel from a fundamentally social event into uroric within the scope of employment for vicarious liability purposes.
Likewise, Gardner’s conduct in this case did not occur "substantially within authorized time and space limits.” The drive back from the Sports Pub took place sometime near 11:00p.m. (well outside of normal work hours), and the accident occurred on a highway in Framingham far from the Wayland job site Gardner was employed to manage. That Cote’s owner encouraged Gardner to take his carpenters to dinner, and at some level expected such dinner to take place at a site away from Wayland, cannot logically mean (as Plaintiff argues) that travel to and from such a venue is occurring within authorized time and space limits. Carpenters driving on a highway at 11:00 p.m., far from the assigned job site, and who were returning to their lodging following an extended evening of drinking, were undeniably not acting within the authorized time and space purview of their employment—regardless of who originated the idea for such an evening and regardless of who picked up the check.
Finally, although Plaintiff argues that Gardner’s dinner with Smith—suggested and paid for by Cote— was designed to serve the interests of the employer (i.e., the showing of appreciation for dedicated employee service), this strikes the Court as something of an overstatement. The purpose of the dinner was dinner; the purpose of Cote paying for it was to convey its appreciation to employees who had worked over the Labor Day holiday. More critically, even if the dinner itself could somehow be deemed to be conduct within the scope of employment, such scope cannot be stretched to extend to Gardner’s conduct in chauffeuring an inebriated Smith to Motel 6 at the conclusion thereof. This is not unlike the case of Lev v. Beverley Enterprises—Massachusetts, 457 Mass. 234 (2010). In Lev, a chef employed by the defendant completed his evening shift and then drove to a Chinese restaurant where he met his supervisor to discuss work-related matters. After leaving the restaurant, the employee became involved in a motor vehicle accident, and the third party injured therein sued his employer on a respondeat superior theory. The Court, however, affirmed summary judgment for the employer, concluding that, even if the employees were acting within the scope of employment during their meeting at the Chinese restaurant, “the scope of his employment ended when he left [the restaurant] to go home.” Id. at 239. The Court wrote:
At that juncture, [the employee] was no longer acting on behalf of or under the direction or control of [the defendant]. He simply was driving home from a meeting with his supervisor, conduct that, substantively, was no different than traveling home after the completion of his shift... Put another way, the employee’s homeward-bound trip from [the restaurant] was not an essential part of his employer’s mission. Because [the employee] was not acting within the scope of his employment at the time he struck and injured the plaintiff, his purportedly negligent actions could not be imputed to [his employer] under a theory of respondeat superior.
It is difficult to distinguish the case at bar from Lev in any meaningful way; and, as in Lev, Gardner cannot be deemed to have been acting within the authorized time and space limits of his duties to Cote, even if dinner at the Sports Pub with Smith served the Company purpose of boosting employee morale.[3]
In opposing summary judgment, Plaintiff places overriding emphasis on the fact that Cote’s owner encouraged Gardner to take his carpenters out to dinner, and then paid for such dinner at a venue where it knew or reasonably should have anticipated that alcohol would be served. The SJC, however, has considered this issue in a nearly identical context, and squarely rejected the notion that vicarious liability can attach in such circumstances. In Mosko v. Raytheon Co., 416 Mass. 395 (1993), an employee of the defendant caused the plaintiff injuries due to his driving while intoxicated on the way home from a company-sponsored Christmas party. Like the present case, the function in Raytheon was held off-site and outside of regular business hours, and attendance by employees was voluntaiy and uncompensated. The Court wrote:
Raytheon’s employee in this case, a product assurance manager who was driving home at the time of the accident, was not engaged in conduct of the kind he was hired to perform. The party was not held on Raytheon’s premises or during working hours. Any intangible benefit to Raytheon of improved employee morale would not be a sufficient basis to transform a purely social occasion, at which attendance was voluntary, into an evening of work . . . An employee’s voluntary attendance at a social event sponsored by his employer, like the party here which was off the employer’s premises and outside of normal working hours, cannot reasonably be viewed as conduct within the scope of his employment.
Raytheon, 416 Mass. at 399-400. See also id. at 400 n.6 (collecting numerous analogous cases in which employees driving to or from employer-sponsored social events were found not to have been acting within the scope of their employment).[4]
In accordance with the foregoing authorities, Gardner cannot be deemed to have been acting within the scope of his employment for Cote at the time of his automobile accident on September 14, 2014. An essential element of vicarious liability chargeable to this employer is, therefore, lacking, and Plaintiffs negligence claims against Cote under the theory of respon-deat superior cannot lie. Summary judgment shall be granted to the Defendant on these claims.
*47 III. PLAINTIFF’S NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION CLAIMS
Further to its claims for respondeat superior liability, Plaintiff has brought claims directly against Cote on account of its own negligence, charging the Company with breaches of due care in connection with its hiring, retention, training and supervision of Gardner.[5] Plaintiffs theory is that, had Cote exercised due care in its personnel practices—Le., checked Gardner’s criminal and driving histories—it would have discovered the danger he posed to the motoring public. Cote not hiring and retaining Gardner, or training and supervising him differently, Plaintiff maintains, would have prevented Gardner from being behind the wheel on the night of September 14, 2010, and thereby avoided the accident that cost Vilidnitsky his life.
Massachusetts recognizes a cause of action in favor of members of the public against employers for the negligent hiring, retention, training and supervision of employees. See Doe v. Town of Blandford, 402 Mass. 831 (1988); Copithorne v. Framingham Union Hospital, 401 Mass. 860 (1988); Foster v. The Loft, Inc., 26 Mass.App.Ct. 289 (1988). In the present case, the record reflects no evidence directed to Cote’s practices in the area of training and supervision, and it is difficult to fathom how the Company could have engaged in training or supervision of Gardner such as would have prevented his drunk driving on the night of September 14, 2010. Accordingly, the Court will confine its analysis to the singular hiring and retention-based claim that Plaintiff has asserted and briefed.
In Foster v. The Loft, Inc., supra, the Appeals Court held that an employer whose employees are brought into contact with the public in the course of the employer’s business has a duty to exercise reasonable care in the selection and retention of such employees. Foster, 26 Mass.App.Ct. at 290. The Court declared;
An employer must use due care to avoid the selection or retention of an employee whom he knows or should know is a person unworthy, by habits, temperament, or nature, to deal with the persons invited to the premises by the employer. The employer’s knowledge of past acts of impropriety, violence, or disorder on the part of the employee is genuinely considered sufficient to forewarn the employer . . .
Foster, supra, at 290-91 (quotation omitted). A breach of the employer’s duly so defined occurs “when the employer becomes aware or should have become aware of problems with an employee” or prospective employee that signaled such individual’s unfitness or potential danger to others, “and the employer failed to take further action such as investigating, discharge or reassignment.” Id. at 291 (citation and quotation omitted). Liability in negligence may then attach to the employer if a member of the public suffers, at the hands of the employee, “a resulting injury that was within the foreseeable risk.” Id. at 295 (citation and quotation omitted).
In Foster, a bar patron was physically assaulted by a bartender employed by The Loft, and brought a claim against the employer for negligent hiring and retention. The claim was premised on evidence that the bartender had a criminal record for assault and battery with a dangerous weapon of which The Loft was aware. The Court upheld a jury verdict in favor of the plaintiff, finding that it was negligent for The Loft to place an individual with a serious criminal record into a position that required dealing with young people in a crowded, alcohol-affected, and volatile environment that carried a high potential for violence. In sustaining the claim, however, the Court emphasized that merely hiring an employee with a criminal record would not, without more, suffice to establish actionable negligence. Rather, negligent hiring and retention claims call for an assessment of the nature of the criminal record and all of the circumstances surrounding the hire—including, most importantly, the nature of the work for which the individual is to be employed, and whether and to what extent a person with his/her known propensities poses an unreasonable risk of harm to the public if so employed. Id. at 291-94. ‘There is no duty when the risk which results in the plaintiffs injury is not one which could be reasonably anticipated by the defendant.” Foley v. Boston Housing Authority, 407 Mass. 640, 646 (1990) (citations and quotation omitted).
In the present case, the overall circumstances surrounding the hiring and retention of Gardner permit no reasonable inference of negligence on the part of Cote such as could fairly attach liability to it for the death of Vilidnitsky which eventuated. It is true that Cote conducted no criminal or driving background checks on its prospective employees, and the performance of such checks would have revealed a history of alcohol-related and other driving infractions. Foster itself, however, makes plain that precisely this type of evidence will not be sufficient to ground negligent hiring/retention liability. Lacking in the chain of causation here is evidence that Cote could reasonably have foreseen that Gardner’s history of driving infractions rendered him a danger to either fellow employees or the public if placed into the particular position of employment for which he was considered and hired. See Foster, 26 Mass.App.Ct. at 290-91. It simply is not so.
Gardner was hired to serve as a construction foreman, a position in which the record discloses no expected interaction with the public at all. Gardner’s work overseeing the Wayland project in this instance likewise entailed no vehicular usage beyond ordinary driving to and from the job site. The evidence is undisputed that Gardner never operated Cote automobiles, and was at no time prior to the accident ever *48 called upon to transport Cote personnel in connection with work-related matters. In these circumstances, Cote’s discovery of Gardner’s troubled driving history would not reasonably have resulted in his non-hire into a job for which driving was not a material (indeed, any) component. See Foster, 26 Mass.App.Ct. at 294 n.7 (“Obviously, the nature of the employee’s criminal record is important. An employee’s past conviction of larceny by check would not make the employer liable, on the basis of the doctrine of negligent hiring or negligent retention, for the employee’s subsequent rape of a customer”). This disconnection between Gardner’s undiscovered driving record and the no-driving construction job he was hired to perform at Cote is fatal to the Plaintiffs claim.
As for the matter of driving under the influence, Cote was not aware that Gardner had experienced any problems with alcohol during the pendency of his employment at the Company. Cote was likewise not involved in any way in the service of alcohol to Gardner on September 14, 2010. Cote encouraged Gardner to take his project carpenters out for a meal that would be paid for by the Company; but there is no evidence that Cote had any reason to anticipate that there would be excessive drinking on this occasion,[6] and no evidence that Cote had any knowledge of what the transportation arrangements for the evening would be.[7] In these circumstances, there is no rational basis upon which to hold Cote responsible in negligence for hiring Gardner and then failing to prevent his reckless driving after an evening of off-hours drinking. Plaintiffs direct negligence claims against the Company, therefore, will not avail and must be dismissed.[8]
CONCLUSION AND ORDER
For all the foregoing reasons, the Defendant’s Motion for Summary Judgment is ALLOWED in its entirety.

 Because the suggested event was “dinner” and the Sports Pub was known to be located in Framingham (rather than Wayland), however, it is reasonable to infer that Samson expected this meal would take place after work hours and not far from the Motel 6 in Framingham where these employees were staying during the week.

 At oral argument, Plaintiffs counsel argued that the dinner could reasonably be inferred to have been mandatory as to Gardner, because Samson reminded him a second time to arrange this for his workers. The argument reduces to the suggestion that two requests from one’s boss are tantamount to a directive. Even if the Court were to accept this questionable assumption, the fact that Gardner was instructed to invite his carpenters to have burgers and beers on the company nickel does not, without more, render the entire event involuntary. The proof of this is revealed in the fact that two of the three employees so invited begged off, and all parties acknowledge that the third had every right to do so. And, if none of the three employees who were the objects of Cote’s attempted expression of appreciation chose to accept Gardner’s invitation, there would undeniably have been no event. The event, therefore, was fundamentally voluntary, and the only thing required of Gardner was that he extend the invitation to his subordinates. Smith accepted this invitation and the Cote-underwritten evening went forward; but this fact allows for no inference that participation in the dinner was mandated by Cote to serve its business interests.

 The Court finds no merit in the asserted distinction that, in the present case, Gardner was driving to motel lodgings paid for by Cote. The essence of the Court’s ruling in this case derives from the fact that the entire context of Gardner’s conduct on the evening of September 14 (and not merely the drive back to his motel room) was social and not significantly related to Cote’s business. The fact that Cote paid for Gardner’s Motel 6 lodging is immaterial, unless one is prepared to accept the proposition that Gardner’s work so far from his actual home effectively rendered him “on the job” at all times—including during his post-Sports Pub drive. This was clearly not the case, as both sides appear to concede.

 At hearing, Plaintiffs counsel argued that the present case can be distinguished from Raytheon on the ground that Gardner’s participation in the dinner was effectively dictated by Cote. Plaintiff was instructed by Samson to invite his carpenters to dinner and, the argument goes, when one of them accepted, the event became a command performance for him. For reasons already stated ante, the Court does not regard this as a reasonable construction of the evidence.

 Plaintiff has advanced parallel allegations in connection with Cote’s employment of Smith. These allegations would appear immaterial, however, inasmuch as Smith was not personally responsible for causing the accident in this case. He was a passenger rather than driver of the vehicle that struck Vilidnitsky, which would seem to render his driving history—and Cote’s ignorance of same—irrelevant. Smith is evidently a party-defendant in this case on account of the fact that he is the owner of the involved vehicle, and thus bears prima facie responsibility for the accident even though he did not actually cause it. See Mass. G.L.c. 231, Sec. 85A. For this reason, and because the allegations of negligence regarding the employment of each of these co-defendants are largely duplicative, the Court will address only the theory of liability as it is presented in connection with Gardner. This analysis applies with equal force to Cote’s claimed negligence in the employment of Smith.

 Indeed, Cote capped its reimbursement for a meal initially envisioned to cover four participants at just $50, a fact that without more belies any notion that the Company placed its imprimatur on an evening contemplated to entail the excessive consumption of alcohol.

 Samson had never been to the Sports Pub, and knew only that it was located in the same town as the Motel 6 where Cote’s employees were staying while they worked on the Wayland project. It would have been entirely reasonable to think that the Sports Pub was walking distance from Gardner and Smith’s motel lodging—at least no less reasonable than inferring that an evening at this tavern necessitated extensive driving. For this reason, Plaintiffs contention—advanced for the first time during oral argument—that actionable negligence can be located in Cote’s encouragement of Gardner to treat his workers to “burger and a beer" proves too much. Even if Samson had been aware of Gardner’s seven-year-old OUI offense, it would not have been negligent for him simply to suggest having a beer and a burger with three fellow employees. Knowledge of Gardner’s OUI history, without more, would not reasonably have allowed Samson to anticipate that his suggested method for conveying appreciation to three other employees ($50 could not have bought more than a single beer and burger for four) would lead Gardner to engage in drunk driving.

 Because the record demonstrates that no sustainable finding of ordinary negligence will attach to Cote on either direct or vicarious liability theories, Plaintiffs punitive damages claims for gross negligence under the Massachusetts Wrongful Death Statute, G.L.c. 229, Sec. 2, necessarily fail as well.