**GREAT NORTHERN INSURANCE COMPANY as subrogee of National Grange Mutual Insurance Company, CNA Commercial Insurance Company as subrogee of Group Benefit Strategies, and National Grange Mutual Insurance Company, Plaintiffs**

v.

**PAINO ASSOCIATES, and Massachusetts Turnpike Authority, Defendants/Third–Party Plaintiffs**

v.

**Caliber One Indemnity Co., Third–Party Defendant**

v.

**Transcore, Inc., Defendant/Third–Party Defendant/Fourth–Party–Plaintiff**

v.

**Manpower, Inc., Fourth–Party Defendant.**

**No. CIV.A.02–12126–REK.**

United States District Court, D. Massachusetts.

April 13, 2005.

James P. Cullen, Jr., Cozen & O'Connor, Philadelphia, PA, for Great Northern Insurance Company as subrogee of National Grange Mutual Insurance Company.

Jonathan Hurwitz, Cozen O'Connor, Philadelphia, PA.

Patrick J. Loftus, III, Law Offices of Patrick Loftus, Boston, for Plaintiff CNA Commercial Insurance Company as subrogee of Group Benefits Strategies.

Donald E. Feener, John C. Barker, Michienzie & Sawin, LLC, Boston, for Defendant Paino Associates.

John Racicot, Michienzie & Sawin, LLC, Boston.

Paul Michienzie, Michienzie & Sawin, LLC, Boston.

Richard A. Sawin, Jr., Michienzie & Sawin, LLC, Boston.

Erica L. Silverman, McCormack & Epstein, Boston, for Defendant Massachusetts Turnpike Authority.

Joseph H. Aronson, McCormack & Epstein, Boston.

Michael J. McCormack, McCormack and Epstein, Boston.

Michael J. Grace, Adler, Pollock & Sheehan, PC, Boston, for Defendant Transcore, Inc. Fourth Party Defendant Manpower, Inc.

Edward F. Whitesell, Jr., Adler, Pollock & Sheehan, PC, Boston.

Grace V. Bacon, Morrison Mahoney LLP, Boston, for Third–Party Defendant Transcore, Inc.

Thomas C. Federico, Morrison Mahoney LLP, Boston.

Matthew C. Oleyer, Keegan, Werlin & Pabian, LLP, Boston, for Third–Party Defendant Caliber One Indemnity Co.

Richard B. Kirby, Keegan, Werlin & Pabian, LLP, Boston, for Third–Party Plaintiff Transcore, Inc.

## Opinion

KEETON, Senior District Judge.

### I. Pending Matters

Pending for decision are matters related to the following filings:

(1) Motion of Third–Party Plaintiff, Massachusetts Turnpike Authority, for Summary Judgment Against Third–Party Defendant, Caliber One Indemnity Co. (Docket No. 62, filed September 2, 2004);

(2) Memorandum in Support of Third–Party Plaintiff, Massachusetts Turnpike Authority's Motion for Summary Judgment Against Third–Party Defendant, Caliber One Indemnity Co. (Docket No. 63, filed September 2, 2004);

(3) Motion of Third–Party Plaintiff, Massachusetts Turnpike Authority, for Summary Judgment Against Third–Party Defendant, Transcore, Inc. (Docket No. 66, filed September 24, 2004);

(4) Memorandum in Support of Third–Party Plaintiff, Massachusetts Turnpike Authority's Motion for Summary Judgment Against Third–Party Defendant, Transcore, Inc. (Docket No. 67, filed September 24, 2004);

(5) Defendant Transcore, Inc.'s Opposition to the Massachusetts Turnpike Authority's Motion for Summary Judgment Against Caliber One Indemnity Company (Docket No. 70, filed October 1, 2004);

(6) Affidavit of Grace V. Bacon (Docket No. 71, filed October 1, 2004);

(7) Opposition of Third–Party Defendant, Caliber One Indemnity Company to Motion for Summary Judgment of Third–Party Plaintiff, Massachusetts Turnpike Authority (Docket No. 73, filed October 6, 2004);

(8) Response of Third–Party Defendant, Caliber One Indemnity Company to Statement of Fact of Third–Party Plaintiff, Massachusetts Turnpike Authority (Docket No. 74, filed October 6, 2004);

(9) Motion to Amend Caption of Opposition of Third–Party Defendant, Caliber One Indemnity Company to Motion for Summary Judgment of Third–Party Plaintiff, Massachusetts Turnpike Authority (Docket No. 75, filed October 7, 2004);

(10) Third–Party Defendant Transcore, Inc.'s Response to Third–Party Plaintiff Massachusetts Turnpike Authority's Statement of Facts Contained in Its Motion for Summary Judgment (Docket No. 79, filed October 26, 2004);

(11) Defendant Transcore, Inc.'s Opposition to the Massachusetts Turnpike Authority's Motion for Summary Judgment and Cross–Motion for Summary Judgment (Docket No. 80, filed October 26, 2004);

(12) Memorandum of Third–Party Plaintiff, Massachusetts Turnpike Authority, in Opposition to Cross–Motion of Third–Party Defendant, Caliber One In-

demnity Co., for Summary Judgment (Docket No. 81, filed October 28, 2004);

(13) Defendant Paino's Motion for Partial Summary Judgment Against Third–Party Defendant Massachusetts Turnpike Authority (Docket No. 83, filed November 1, 2004);

(14) Defendant Paino's Motion for Partial Summary Judgment Against Third–Party Defendant Massachusetts Turnpike Authority (Docket No. 84, filed November 1, 2004);

(15) Defendant Paino's Motion for Summary Judgment Against Plaintiff Great Northern (Docket No. 85, filed November 1, 2004);

(16) Letter (non-motion) from John Racicot dated November 2, 2004 (Docket No. 88, filed November 2, 2004);

(17) Memorandum of Third–Party Plaintiff, Massachusetts Turnpike Authority, in Opposition to Cross–Motion of Third–Party Defendant, Transcore, Inc., for Summary Judgment (Docket No. 91, filed November 24, 2004);

(18) Opposition of Third–Party Defendant, Caliber One Indemnity Company to Defendant Paino's Motion for Partial Summary Judgment Against Third–Party Defendant Massachusetts Turnpike Authority (Docket No. 92, filed November 30, 2004);

(19) Response By Third–Party Defendant, Caliber One Indemnity Company to Defendant Paino's Concise Statement of Facts, in Support of Its Motion for Partial Summary Judgment Against Third–Party Defendant Massachusetts Turnpike Authority (Docket No. 93, filed November 30, 2004);

(20) Cross–Motion of Defendant, Massachusetts Turnpike Authority, for Summary Judgment Against Paino Associates (Docket No. 94, filed December 1, 2004);

(21) Memorandum of Defendant, Massachusetts Turnpike Authority, in Opposition to Motion of Paino Associates for Partial Summary Judgment, and in Support of the Massachusetts Turnpike Authority's Cross–Motion for Summary Judgment Against Paino Associates (Docket No. 95, filed December 1, 2004);

(22) Third–Party Defendant Transcore, Inc.'s Motion to Strike Certain Exhibits Attached to Third–Party Plaintiff, Massachusetts Turnpike Authority's Opposition to Its Cross–Motion for Summary Judgment (Docket No. 97, filed December 13, 2004);

(23) Exhibit A (Docket No. 99, filed December 15, 2004);

(24) Motion of Defendant, Massachusetts Turnpike Authority, for Summary Judgment Against Plaintiffs, Great Northern Insurance Company, CNA Commercial Insurance Company and National Grange Mutual Insurance Company (Docket No. 100, filed December 16, 2004);

(25) Memorandum of Defendant, Massachusetts Turnpike Authority, in Support of Motion for Summary Judgment Against the Plaintiffs, Great Northern Insurance Company and CNA Commercial Insurance Company (Docket No. 101, filed December 16, 2004);

(26) Opposition of Third–Party Plaintiff, Massachusetts Turnpike Authority, to Third–Party Defendant, Transcore, Inc.'s Motion to Strike (Docket No. 102, filed December 20, 2004);

(27) Defendant Transcore, Inc.'s Motion for Summary Judgment Against the Plaintiffs (Docket No. 105, filed December 30, 2004);

(28) Defendant Transcore, Inc.'s Memorandum of Law in Support of Its Motion for Summary Judgment Against the Plaintiffs (Docket No. 106, filed December 30, 2004);

(29) Third–Party Defendant Transcore, Inc.'s Motion for Summary Judgment

Against Third–Party Plaintiff Paino Associates (Docket No. 108, filed December 30, 2004);

(30) Joint Motion to Modify Scheduling Order By One Week (Docket No. 109, filed December 30, 2004);

(31) Third–Party Defendant Transcore, Inc.'s Memorandum of Law in Support of Its Motion for Summary Judgment Against Third–Party Plaintiff Paino Associates (Docket No. 110, filed December 30, 2004);

(32) Third–Party Defendant Transcore, Inc.'s Reply to Third–Party Plaintiff, Massachusetts Turnpike Authority's Opposition to Its Cross–Motion for Summary Judgment (Docket No. 111, filed January 4, 2005);

(33) Motion for Summary Judgment in Favor of Fourth–Party Defendant Manpower, Inc. (and Request for Oral Argument) (Docket No. 112, filed January 7, 2005);

(34) Memorandum of Fourth–Party Defendant Manpower, Inc. in Support of Its Motion for Summary Judgment (Docket No. 113, filed January 7, 2005);

(35) Affidavit of Edward F. Whitesell, Jr. (Docket No. 114, filed January 7, 2005);

(36) Joint Motion of Plaintiffs and Defendant Massachusetts Turnpike Authority to Dismiss Massachusetts Turnpike Authority (Docket No. 116, filed January 28, 2005);

(37) Defendant Paino's Objection to Joint Motion to Dismiss Defendant Massachusetts Turnpike Authority (Docket No. 117, filed February 10, 2005);

(38) Defendant Paino's Objection to Joint Motion to Dismiss Defendant Massachusetts Turnpike Authority (Docket No. 118, filed February 11, 2005);

(39) Fourth–Party Plaintiff Transcore, Inc.'s Limited Opposition to Fourth–Party Defendant Manpower, Inc.'s Motion for Summary Judgment (Docket No. 119, filed February 18, 2005);

(40) Affidavit of Grace V. Bacon in Support of Transcore, Inc.'s Limited Opposition to Manpower, Inc.'s Motion for Summary Judgment (Docket No. 120, filed February 18, 2005);

(41) Defendant Paino's Opposition to Cross–Motion for Summary Judgment By Massachusetts Turnpike Authority Against Paino (Docket No. 121, filed February 21, 2005);

(42) Defendant Paino's Opposition to Motion for Summary Judgment By Fourth–Party Defendant Manpower (Docket No. 122, filed February 21, 2005);

(43) Defendant Paino's Opposition to Motion for Summary Judgment By Third–Party Defendant Transcore (Docket No. 123, filed February 21, 2005);

(44) Affidavit of John C. Barker in Support of Defendant Paino's Oppositions to Motions for Summary Judgment (Docket No. 124, filed February 21, 2005);

(45) Plaintiffs' Response to Defendant Paino's Concise Statement of Facts (Docket No. 125, filed February 22, 2005);

(46) Plaintiffs' Memorandum of Law in Opposition to Defendant Transcore and Defendant Paino's Motions for Summary Judgment (Docket No. 126, filed February 22, 2005);

(47) Exhibits (Docket No. 127, filed February 22, 2005);

(48) Motion of Third–Party Defendant Massachusetts Turnpike Authority to Continue Hearing on Motions Scheduled for March 24, 2005 (Docket No. 133, filed March 22, 2005);

(49) Plaintiffs' Reply to Third Party Defendant Massachusetts Turnpike Authority's Motion to Continue the Hearing Set for Tomorrow—March 24, 2005 (Docket No. 134, filed March 23, 2005); and

(50) Assented to Stipulation of Dismissal under Fed.R.Civ.P. 41(c) of Cross-claims Between Defendants Paino Associates and Massachusetts Turnpike Authority (Docket No. 135, filed March 24, 2005).

## II. Factual and Procedural Background

This case stems from a series of fires started by Timothy Mickiewicz in an office building in Auburn, Massachusetts, in November 2001. The first three fires resulted in little damage, but the fourth and final fire largely destroyed the building. Mickiewicz admitted that he had set all four fires, pleaded guilty, and was convicted of four counts of arson on June 24, 2003.

This action was initiated in this court on October 30, 2002, by two insurers, Great Northern Insurance Company ("Great Northern") and CNA Commercial Insurance Company ("CNA"), in subrogation of the rights of two tenants of the building. One of those two tenants, National Grange Mutual Insurance Company ("National Grange") is also a plaintiff in this case. It seeks to recover alleged damages from the fire that were not covered by the insurance policy.

The complaint alleged negligence on the part of the building owner, Paino Associates, LLC, and two other tenants: the Massachusetts Turnpike Authority ("MTA") and Transcore, Inc.

The defendants answered and added cross-claims against one another for contribution, indemnity, and breach of contract. MTA brought a third-party claim against Caliber One Indemnity Company ("Caliber One") claiming breach of contract for failure to indemnify and defend. Finally, Transcore brought fourth-party claims for indemnity, breach of contract, negligence, and contribution against Manpower, Inc. These claims are denominated "fourth-party" claims because at the time Transcore's complaint was filed, Transcore was a third-party defendant and did not have claims directly against it by the plaintiffs.

After the close of discovery, the parties filed a series of summary judgment motions against each other. The defendants have each moved for summary judgment against the plaintiffs. (Docket Nos. 85, 100, 105) The defendant MTA has moved for summary judgment on its third-party complaint against Caliber One (Docket No. 62), and Caliber One has cross-moved for summary judgment in its favor (Docket No. 75). The defendants have also moved for summary judgment on their cross-claims against each other. (Docket Nos. 66, 83, 94, 108) Fourth-party defendant Manpower has moved for summary judgment against Transcore. (Docket No. 112) The parties have filed their oppositions to each of these motions, with the exception of MTA's motion for summary judgment against the plaintiffs. The plaintiffs have moved to dismiss their claims against MTA. (Docket No. 116) Paino Associates initially opposed this motion (Docket No. 117), but then withdrew that opposition with its stipulation of dismissal (Docket No. 135). Finally, Transcore has moved to strike some exhibits submitted by MTA. (Docket No. 97)

The parties have, by agreement, extended the response period for these motions several times. The final extension ended on February 21, 2005, and this court heard argument on these motions on March 24, 2005. At the hearing, the court allowed MTA's motion to continue argument on its motions and arguments against it. Accordingly, this opinion does not address those motions. (Docket Nos. 62, 66, 75, 97, 116) At the hearing, Paino Associates withdrew its motion for summary judgment against the plaintiffs. (Docket No. 85) Finally, pursuant to a stipulation of dismissal, Paino Associates and MTA withdrew

their motions for summary judgment against each other. (Docket Nos. 83, 94) The remaining motions for decision in this memorandum are Transcore's motion for summary judgment against the plaintiffs (Docket No. 85), Transcore's motion for summary judgment against Paino Associates (Docket No. 108), and Manpower's motion for summary judgment against Transcore (Docket No. 112).

### III. Disposition of Summary Judgment Motions

#### A. Introduction

##### 1. Summary Judgment Standard

Summary judgment should be granted only where the court, viewing the evidence in the light most favorable to the non-moving party, determines that no genuine dispute of material fact exists. *See* Fed. R.Civ.P. 56. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Then the non-moving party must demonstrate that *"every essential element* of its claim or defense is at least trialworthy." *Price v. General Motors Corp.*, 931 F.2d 162, 164 (1st Cir.1991).

A dispute is genuine if it "may reasonably be resolved in favor of either party." *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir.1997). Facts are "material" if they possess "the capacity to sway the outcome of litigation under the applicable law." *Id.* The facts in genuine dispute must be significantly probative in order for summary judgment to be denied; "conclusory allegations, improbable inferences, and unsupported speculation will not suffice." *Id.* (alteration and quotation marks omitted).

Moreover, "[t]he standards are the same where ... both parties have moved for summary judgment." *Bienkowski v.*

*Northeastern Univ.*, 285 F.3d 138, 140 (1st Cir.2002) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720, at 335–36 (3d ed. 1998) ("The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.")). In complex, multi-party cases such as this one, this rule must be applied to each summary judgment motion in turn.

##### 2. Facts Related to Negligence Claims

First, I will recite the facts that are, except as noted, undisputed by any parties.

At all relevant times, Paino Associates owned an office building at 27 Midstate Drive, Auburndale, Massachusetts. (Paino Dep. at 186) Paino Associates leased Suites 202 and 214 to MTA, and Suite 220 to Transcore. (Transcore Memo., Docket No. 110, Exh. A, Rahn Aff. [hereinafter "Rahn Aff."], ¶¶ 6, 8) Transcore occupied all three suites. (*Id.*, ¶ 3) Mickiewicz worked in Suite 214. (*Id.*, ¶ 11) The plaintiffs also leased office space in the building. Two bathrooms were located on the second floor of the Midstate building: one for men and one for women. (Paino Dep. at 37) These bathrooms were accessible to anyone on the second floor from a common hallway. (*Id.*) The attic to 27 Midstate Drive could be accessed through a door in the men's bathroom. (*Id.* at 39)

Transcore had two contracts to provide services to the MTA. The first, titled the "Electronic Toll Agreement," involved the development and operation of the MTA's "Fastlane" electronic toll and billing system. (Rahn Aff., ¶ 5) The second, titled the "Violation Processing System and Violation Processing Services Agreement"

("VPS Agreement"), required Transcore to administer violation notices, payments, and the appeals system for violations of the electronic toll system. (*Id.*, ¶ 11) At the time of the fires, Mickiewicz worked under the VPS Agreement. (*Id.*)

In September 2000, Transcore requested temporary employees from Manpower. One of the temporary workers that Manpower provided was Timothy Mickiewicz. (Eckert Dep. at 59) Mickiewicz applied to work for Manpower in December 1999, having graduated high school in June 1999. (Whitesell Aff., Docket No. 114, Exh. J) On his application, he checked a box indicating that he did not have a criminal record. (*Id.*) A Manpower employee, Robert Powers, indicated on Mickiewicz's employment record that Mickiewicz could not begin work until after his 18th birthday because he was "in lockup" until then. (Spengler Dep. at 116) Manpower performed a criminal background check for Mickiewicz which "came up clean." (Spengler Dep. at 104) A later-obtained CORI report shows that Mickiewicz did not have any adult criminal record at the time of the fires. (Whitesell Aff., Exh. K) The record does not disclose why Mickiewicz was in "lockup" until his 18th birthday, whether for a juvenile offense or for some other reason.

Mickiewicz was first assigned to Transcore in September 2000. He worked for Transcore sporadically in September and October 2000. (Rahn Dep. at 29) He began working full time, but still as a contract employee, in December 2000. (*Id.*) Transcore briefly interviewed contract employees on the first day they arrived from Manpower to inform the employees of their responsibilities and determine whether they appeared to have the appropriate skills for the job. (*Id.* at 62) Mickiewicz first worked in customer service, but in February 2001 became an appeals clerk. (Spengler Dep. at 200–01) As an appeals clerk, he handled incoming appeals of vio-

lations of the MTA's Fastlane system. (Eckert Dep. at 27–28) Deborah Eckert of Transcore supervised Mickiewicz's day-to-day activities. (Rahn Dep. at 58) Manpower also had two supervisory employees, Robert Powers and Sheila Apkarian, on location at the site. (Apkarian Dep. at 18–19) These employees, Manpower asserts, were present only to resolve any "performance" issues with employees but did not direct their day-to-day activities. (Spengler Dep. at 167–68) Transcore contests this characterization of their role.

Mickiewicz had few problems working at Transcore at first. Transcore gave Mickiewicz an "Employee of the Month" award in August 2001. (Eckert Dep. at 60) He had also been promoted from customer service to appeals clerk. After the September 11, 2001, terrorist attacks, however, Mickiewicz became despondent. (Eckert Dep. at 121) He took a leave of absence and did not work for Manpower for several weeks in September and October 2001. (Spengler Dep. at 122–27) His father called Mickiewicz's supervisor at Manpower and informed him that Mickiewicz would be unavailable for medical reasons and that he was "in the hospital." (*Id.* at 122) The record is unclear whether this hospitalization was "drug rehab," as it was rumored to be by some employees (Ferrara Dep. at 46), or was some other sort of voluntary rehabilitation program (Apkarian Dep. at 140–41).

Before Mickiewicz returned to work, he wrote a letter expressing his concerns about the use of drugs in the workplace. (Eckert Dep. at 71–72) He identified three employees who he said used marijuana regularly, even at the office. (*Id.* at 71–72) This environment, he said, would make it difficult for him to return to work. (*Id.* at 71–72) Mickiewicz also spoke with Robert Powers at Manpower about his concerns. (Spengler Dep. at 124–25) On another oc-

casion, Mickiewicz expressed concerns about drug-related threats from other employees to Transcore's Robert Ferrara, who passed on this concern to Transcore's David Miller. (Ferrara Dep. at 48) In response, Manpower required Mickiewicz and some other employees to take a drug test. (Eckert Dep. at 126) The other employees left the company rather than take the test. (*Id.* at 72) Mickiewicz took the drug test and passed. (*Id.* at 126)

Manpower occasionally tested its employees for drug use. Mickiewicz was tested a total of four times: the first occurred when he returned from leave on October 19, 2001; the second occurred immediately before his return to Transcore on October 26, 2001; the third on November 21, 2001; and the final one on January 17, 2002. (Spengler Dep. at 130–34, 159) Mickiewicz passed the first two tests. (*Id.* at 134) The third test came back "diluted," which Manpower treated as a pass. (*Id.* at 158; Eckert Dep. at 186) A Transcore employee suggested that this result was inconclusive. (Eckert Dep. at 186) During the time of these tests, some employees stated that Mickiewicz smelled of marijuana. (Spengler Dep. at 136; Eckert Dep. at 122–24) Further indications of drug use, including Mickiewicz falling asleep at his desk, occurred after the final fire. (Apkarian Dep. at 62–63)

The first fire occurred on November 12, 2001. This fire began in the stairwell that leads to the attic above the second floor men's restroom. (Paino Dep. at 51–51) This fire created a burned area in the insulation roughly the size of a basketball. (*Id.* at 51) James Paino, the manager of Paino Associates, noticed marks on the door to the attic that indicated to him that the door had been forced. (*Id.* at 52) The attic door had an ordinary door knob lock, not a deadbolt, and Paino stated that he always kept it locked. (*Id.* at 40, 49) A second fire was set on November 14, 2001,

this time in the dropped ceiling above the men's restroom. (*Id.* at 52–53) This fire caused little more than smoke damage and apparently was set using rolls of toilet paper. (*Id.* at 55) After this second fire, the landlord installed a deadbolt on the bathroom door and distributed one key to each of the tenants of the building. (*Id.* at 60–62) At some point in mid-November, Transcore manager David Miller reported that he had lost a key, so Paino changed the lock and distributed new keys. (*Id.* at 61) At one point in his deposition, Paino states that he distributed new keys to each tenant (*id.* at 61); elsewhere he states that he only distributed a key to Transcore (*id.* at 121).

The third fire was set on November 29, 2001. This fire was also set in the men's bathroom. (*Id.* at 69) Paino met with Lieutenant Anderson of the Massachusetts State Police on the morning of November 30, 2001, and discussed installing security cameras. (*Id.* at 71–72; Anderson Dep. at 90–92) According to Paino, that morning he met with a locksmith and agreed to install a swipe card system in the bathroom. (Paino Dep. at 69–70) But these measures were never taken. (*Id.* at 70, 72)

After the third fire, Transcore also took steps to increase security. It set up a table in the hallway outside the two bathrooms with a sign-out sheet for the bathroom keys. (Micciche Dep. at 25) Transcore placed an employee there to monitor the keys and the sign-out sheet. (*Id.* at 25) The employees that Transcore used were not uniformed security guards. One of the employees used for monitoring was a temporary employee from Manpower who was asked to continue doing her work of stuffing envelopes while sitting at the table. (*Id.* at 34–35) Manpower was aware that its employees were being used in this capacity. (Apkarian Dep. at 156–57) This

sign-out system was begun in the afternoon of November 29, 2001. (Micciche Dep. at 30) The second-to-last entry on the sign-out sheet, at 3:01 p.m. on November 30, 2001, was that of Timothy Mickiewicz. (Bacon Aff., Docket No. 106, Exh. 16)

Mickiewicz set the fourth and final fire after entering the restroom on the afternoon of November 30, 2001. According to one report, Mickiewicz stated that he found the door to the attic unlocked, so he went inside and set the fire on the paper lining the attic insulation using a match. (Pls.' Memo., Docket No. 126., Exh. A, Miller Report, at 7–8) This fire spread through the attic and largely destroyed the office building at 27 Midstate Drive. (Id., at 2) Transcore has objected to the reference to Mickiewicz's statement in the report because it is inadmissible hearsay. Other evidence, however, also suggests that the attic door was left unlocked.

At about 8:00 a.m. on the day of the final fire, Daniel Cardin, a contractor working for Paino Associates, entered the attic to do some work on the heating system. (Cardin Dep. at 10) He says that he gained access to the attic by asking the hall monitor, who, in turn asked her supervisor. (Id. at 10) Cardin stated that a man named "Rocco or Rocky" then unlocked the bathroom and the attic. (Id. at 11–12) Cardin states that he locked the attic door and then returned the key to the hall monitor. (Id. at 12) At about 10:00 or 10:30 a.m., some Manpower employees complained about the air quality, so Manpower hired a contractor to check the air conditioning unit. (Micciche Dep. at 38–40) Rocco Micciche and Miller, Transcore employees, met with the contractor and went through the attic door to access the air conditioning system. (Id. at 41) According to Micciche, the attic door was unlocked when he went up to the attic with Miller and the contractor. (Id. at 41) Micciche left the attic door ajar after accessing the attic. (Id. at 45)

The following facts are disputed. Transcore and Manpower dispute whether Transcore requested that Manpower perform a criminal background check on Mickiewicz before supplying him to Transcore. Manpower asserts that criminal background checks were performed only upon specific request (Spengler Dep. at 104), but Transcore avers that it had a "standing requirement" for criminal background checks. (Rahn Dep. at 60–61) Transcore and Manpower dispute the degree of control exercised by the two Manpower employees on site over the temporary employees. Manpower characterizes its control as "administrative" rather than "substantive." Manpower did conduct performance reviews. (Id. at 68) Manpower and Transcore also dispute the significance of the "diluted" drug test sample.

Paino Associates and Transcore dispute whether Paino directed Micciche to leave the attic door ajar and whether Paino told Micciche that Paino was leaving the attic door unlocked on the day of the fire because an electrician would be in and out all day. (Paino Dep. at 111–12; Micciche Dep. at 41–42, 45) Paino Associates and Transcore also dispute whether Transcore had a key to the attic. Paino himself believed that none of the tenants had a key to the attic. (Paino Dep. at 39–40) But the record suggests that Transcore manager Micciche was also able to unlock the attic door. (Cardin Dep. at 10–11) Transcore objects to the admission of testimony from one of the fire investigators that relays Mickiewicz's statement that he would not have entered the attic if the door had been locked.

3. **Facts Relevant to Insurance Matters Between Plaintiffs and Defendants**

Transcore and Paino Associates have advanced an argument in their motions for

summary judgment against the plaintiffs that the plaintiffs' claims should be void due to allegedly fraudulent claims made by National Grange to its insurer Great Northern who now "stands in the shoes" of that tenant bringing its subrogated claims. After the November 2001 fire, National Grange was forced to move their operations elsewhere until some time in 2002. (Def. Paino Associates's Statement of Facts, Docket No. 85, ¶ 6) The tenants submitted claims to their insurers, which included invoices of some items that were shipped to other offices around the country and claims for other expenses incurred at those other offices. (*Id.*, Exh. 5) Paino Associates also submits an email from one of the tenants discussing alleged overpayment of rent. (*Id.*, Exh. 8)

Paino Associates withdrew this motion at the hearing on March 24, 2005, but Transcore adopted this argument in its motion for summary judgment (Docket No. 105) and argued this point at the hearing.

### 4. Facts Relevant to Cross–Claims Between Defendants for Indemnification

During the relevant time period, Paino Associates leased suites 202 and 214 to MTA, and suite 220 to Transcore. These leases each contained mutual indemnity provisions (Bacon Aff., Docket No. 110, Exh. 1, § 15; Exh. 2, § 15; Exh. 3, § 17), which the defendants have sought to invoke in their cross-claims against each other. The lease between Paino Associates and Transcore provided in relevant part:

17. *INDEMNIFICATION AND LIABILITY.* Lessee shall indemnify and hold Lessor harmless from all loss and damage to person and property . . . occurring upon the Premises or in or about the Building . . . . Said obligation to indemnify and hold the Lessor harmless shall be with respect to any and all claims . . . except if such injury, death or damage or loss was caused by the negligent or intentional wrongful acts or omissions of the Lessor.

\* \* \* \* \* \*

Lessor shall indemnify and hold Lessee harmless from all loss and damage to person and property . . . occurring in or about the Building . . . . Said obligation to indemnify and hold the Lessee harmless shall be with respect to any and all claims . . . except if such injury, death or damage or loss was caused by the negligent or intentional wrongful acts or omissions of the Lessee.

(Bacon Aff., Docket No. 110, Exh. 3)

These leases also contained a provision requiring the lessee to maintain liability insurance. (Bacon Aff., Docket No. 110, Exh. 1, § 16; Exh. 2 § 16; Exh. 3 § 18) In the lease between Paino Associates and Transcore, this clause stated in relevant part:

18. *LESSEES LIABILITY INSURANCE.* Lessee shall maintain with respect to the Leased Premises and the property of which the Leased Premises are a part comprehensive public liability insurance in the amount of One Million ($1,000,000) Dollars with property damage coverage in limits of Five Hundred Thousand ($500,000) Dollars in responsible companies qualified to do business in Massachusetts and in good standing therein insuring Lessor as well as Lessee against injury to persons or damage to property as provided.

(Bacon Aff., Docket No. 110, Exh. 3)

### B. Plaintiffs' Claims for Negligence in Providing Security

The plaintiffs have advanced, against Paino Associates and Transcore, only a claim of negligent provision of security. The plaintiffs expressly disclaim that they are pursuing a respondeat superior theory of liability and do not mention a negligent

supervision claim. Defendant Transcore has moved for summary judgment on the plaintiffs' negligence claim, as well as adopting an argument, first presented by Paino Associates but later withdrawn, that some of the claims presented to the insurer were allegedly fraudulent and that this fraud bars the plaintiffs' claims. I will address the latter argument in Part D, below. I will address Transcore's negligence argument here.

Transcore's primary contention is that it had no legal duty to provide security to the other tenants in the building. Transcore argues that it had no obligation to monitor the attic or the restroom because they were not under Transcore's control, but instead were part of the common areas in the building. Transcore argues that it did not assume a duty to secure the restroom by operating the sign-out sheet; instead, it argues that it was monitoring the key, rather than the restroom or the door to the attic. Transcore also argues that even if it had a duty to secure the restroom, no evidence exists that it was negligent in that duty.

■ "It is a fundamental principle of the law of negligence that liability will not lie in the absence of a legal duty owed by the defendant to the plaintiff." *Ciccone v. USAirways, Inc.*, 144 F.Supp.2d 30, 36 (D.Mass.2001). The plaintiffs have the burden of establishing that this "essential element" presents an issue that is "at least trialworthy." *Price*, 931 F.2d at 164 (emphasis removed). Whether a legal duty exists is a question of law for the court to decide. *Davis v. Westwood Group*, 420 Mass. 739, 743, 652 N.E.2d 567 (1995). In this case, two legal theories support the proposition that Transcore owed a legal duty to the other tenants in the building.

■ First, "a duty of care may arise from the right to control land, even where the person held to such a duty does not own the land in question." *Davis*, 420

Mass. at 744–45, 652 N.E.2d 567 (finding no duty because defendant did not control adjacent public highway where accident occurred). In this case, the plaintiff has introduced evidence that Transcore controlled access to the bathroom. Transcore's insistence that it controlled only the key and not the interior of the bathroom is too fine a line to draw and lacks merit. Recognizing that free access to the men's room provided an opportunity for arson, Transcore and Paino Associates took steps to remedy the situation. The first step they took was to control the key to the bathroom, and, when that failed and the third fire was set, Transcore placed a monitor outside the bathroom and instituted a sign-out system. Unlike in *Davis*, where the defendant did not possess the authority to take the remedial steps urged by the plaintiff, such as constructing a pedestrian footbridge or a traffic light, Transcore has not established that it could not have taken additional steps to monitor the inside of the men's bathroom. A reasonable jury could find that Transcore shared control over the bathroom with the landlord and therefore owed a duty to the plaintiffs. The plaintiffs have also produced evidence upon which a reasonable jury could conclude that Transcore controlled access to the attic. Transcore thus also owed a duty to the plaintiffs to exercise due care in its control of access.

■ The second theory upon which Transcore could be found to have a duty to the plaintiffs is voluntary assumption of duty. "It is an established principle that a duty voluntarily assumed must be performed with due care." *Mullins v. Pine Manor College*, 389 Mass. 47, 52, 449 N.E.2d 331 (1983) (finding that a college that voluntarily provides security guards on campus must exercise reasonable care when it does so). Massachusetts has

adopted the rule from the Restatement (Second) of Torts, § 323:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

See *Cottam v. CVS Pharmacy*, 436 Mass. 316, 323 & n. 2, 764 N.E.2d 814 (2002). Transcore asserts that the only duty it undertook was to monitor the key and the interior of the bathroom, but again, this distinction is without substance. Although the court in *Davis* allowed the defendant to define narrowly the scope of the voluntary duty undertaken, *see id.*, 420 Mass. at 746–47, 652 N.E.2d 567 (finding that the defendant undertook a "discrete task" of hiring police officers to help with pedestrians across the road but did not thereby assume a "broader duty" of ensuring safe passage), the plaintiffs in this case charge that Transcore performed that more limited duty, the monitoring itself, negligently, *cf. id.* at 747, 652 N.E.2d 567 (noting that the defendant assumed a duty to exercise due care in the "particular task of hiring those officers").

Under either of these two theories, Transcore owed a duty to the plaintiffs in this case. Accordingly, Transcore's motion for summary judgment is denied in this respect.

## C. Cross–Claims Based on Negligent Hiring, Retention, and Supervision of Mickiewicz

 As noted above, the plaintiffs do not advance a claim of negligence due to Manpower and Transcore's hiring, reten-

tion, and supervision of Mickiewicz. The defendants, however, assert such claims against each other as a basis for claims for contribution. Even though the plaintiff does not advance this theory of negligence, the defendants, to the extent that they are found liable, may have a right to contribution from one another on this theory. *See Panagakos v. Walsh*, 434 Mass. 353, 354–55, 749 N.E.2d 670 (2001) ("In order to state a claim for contribution from a joint tort-feasor, the party seeking contribution must show that the potential contributor is directly liable to the tort plaintiff."). This court, therefore, must address these claims to determine whether a triable issue of fact remains under this theory of negligence.

The closely related torts of negligent hiring, retention, and supervision impose liability upon an employer for tortious conduct of its employees outside the purview of the doctrine of respondeat superior. Courts have found this expanded liability in cases where the employer could have reasonably foreseen that the employee posed a risk to customers, members of the public, or co-workers. *See Foster v. The Loft, Inc.*, 26 Mass.App.Ct. 289, 291 & n. 4, 526 N.E.2d 1309 (1988). The torts are closely related because, in combination, they impose a continuing duty upon employers to respond appropriately to information known or reasonably available to them about an employee, both at initial hiring and during the course of employment. *See id.* at 294–95, 526 N.E.2d 1309. "Negligent supervision" is probably a more accurate label for the tort of negligent retention, because in some situations the appropriate course of action for an employer is to dismiss an employee and in other situations it may be more appropriate to reassign that employee or take some other course of action. *See id.* at 291, 526 N.E.2d 1309 ("Negligent retention occurs when, during the course of employment, the employer becomes aware or should

have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge or reassignment.") (alteration and quotation marks omitted).

Regardless of the particular labels applied to the tort, the first stage of the inquiry requires an examination of the facts about the employee known by the employer or reasonably available to the employer. *See Or v. Edwards,* 62 Mass. App.Ct. 475, 482–83, 818 N.E.2d 163 (2004). The Massachusetts courts have been reluctant to impose an affirmative duty upon employers to perform an extensive criminal background check in all cases, *see Coughlin v. Titus & Bean Graphics, Inc.,* 54 Mass.App.Ct. 633, 639–40, 767 N.E.2d 106 (2002); *Foster,* 26 Mass.App.Ct. at 295 n. 8, 526 N.E.2d 1309, but some situations will compel further inquiry, *see Or,* 62 Mass.App.Ct. at 483, 818 N.E.2d 163.

On the basis of the knowledge or imputed knowledge, several questions of legal significance arise: first, was it foreseeable that some harm could come to "related persons," in which case a duty of reasonable care is owed to those persons, *see Or,* 62 Mass.App.Ct. at 483, 818 N.E.2d 163; second, would a reasonably prudent person have acted upon that knowledge differently than the defendant, *see Foster,* 26 Mass. App.Ct. at 291, 526 N.E.2d 1309; and third, would those steps that a reasonable person would have taken make any difference, *see Or,* 62 Mass.App.Ct. at 489–90, 818 N.E.2d 163. The basic question is one of foreseeability of harm based on the available information.

In some cases, Massachusetts courts have decided foreseeability as a matter of law. *Coughlin,* 54 Mass.App.Ct. at 639, 767 N.E.2d 106 (upholding summary judgment for defendant on the grounds that a criminal record showing a conviction for violent crime, by itself, does not suggest a propensity for murder). In most cases, however, Massachusetts courts have held that the jury decides whether an event was foreseeable. *See, e.g., Copithorne v. Framingham Union Hosp.,* 401 Mass. 860, 865, 520 N.E.2d 139 (1988) (reversing summary judgment for defendant on grounds that jury could decide whether rape of patient was foreseeable from reports of previous sexual assaults on the job); *Foster,* 26 Mass.App.Ct. at 294, 526 N.E.2d 1309 (criminal record combined with volatile work environment created jury question on the issue of foreseeability); *Or,* 62 Mass.App.Ct. at 483, 818 N.E.2d 163 (jury could decide whether criminal record, pending indictment, and known drug problems suggested risk of rape, kidnap, and murder). Those cases that have taken the matter from the jury have done so on the basis of public policy. *See Coughlin,* 54 Mass.App.Ct. at 640 n. 8, 767 N.E.2d 106 (expressing public policy in favor of rehabilitating those with criminal records) (quoting *Foster,* 26 Mass.App.Ct. at 294 n. 6, 526 N.E.2d 1309); *see also Davis,* 420 Mass. at 743, 652 N.E.2d 567 ("In determining whether the defendant had a duty to be careful, we look to existing social values and customs, as well as to appropriate social policy."). A federal court, sitting in diversity jurisdiction on a question of state law, must be careful not to intrude on a state's ability to make its own policy, but must decide what rule the state's highest court would adopt in this situation.

In this case, the defendants have not identified an expressed social policy of the Massachusetts courts that would take the question of foreseeability away from the jury in this case. Defendant Manpower argues that allowing the jury to reach the question of foreseeability would create a disincentive to employ those with criminal records. That policy has been expressed by the Massachusetts state courts and

should be given deference by this court. *See Coughlin,* 54 Mass.App.Ct. at 639–40 & n. 8, 767 N.E.2d 106. That policy, however, is not squarely implicated here. A reasonable employer might have acted differently in this situation for several reasons, only one of which was the suggestion that Mickiewicz had a juvenile record. Some additional reasons include the unusual circumstances of Mickiewicz's return to work, the suggestions of drug use and other criminal activity, and, of course, the series of fires that took on the appearance of an "inside job."

If this court were to hold that there was no liability in these circumstances, then the Massachusetts policy of providing an opportunity for rehabilitation of those with a criminal record would be expanded into an immunity from tort liability for those employers who employed someone with a criminal record despite other indications of dangerousness. The Massachusetts rule is not so broad, and Massachusetts courts still impose liability if other evidence indicates that the employee poses a risk to others. *Compare Coughlin,* 54 Mass.App. Ct. at 639–41, 767 N.E.2d 106 (finding no liability where only information upon which employer could have predicted criminal act was prior criminal record) *with Or,* 62 Mass.App.Ct. at 482–83, 818 N.E.2d 163 (allowing jury to draw inference that employee posed a danger where additional evidence was available to employer, aside from criminal record) *and Foster,* 26 Mass. App.Ct. at 294–95, 526 N.E.2d 1309 (finding liability where evidence of a volatile work environment existed as well as evidence of an employee's criminal record). Instead, I find that the appropriate policy of the Commonwealth of Massachusetts to invoke in this case is the policy of submitting these factual matters to the jury. *See Or,* 62 Mass.App.Ct. at 491, 818 N.E.2d 163 ("Juries have a special place and value when it comes to handling the issue of limitation on liability, for here community

standards—conceptions about what is right—should and inevitably do play their part.").

Accordingly, the Order below denies summary judgment on this ground.

### D. Fourth–Party–Claims by Transcore Against Manpower

■ Manpower argues that it can not be found liable as a matter of law under any of Transcore's claims of negligence, breach of contract, indemnity, or contribution. Manpower's core argument is that each of these claims contained, as necessary "postulates," a finding that Mickiewicz's arson was foreseeable by Manpower. (*See* Manpower Memo., Docket No. 113, at 2) This core argument, for the reasons stated in Parts III.B and III.C, above, relies upon material issues of disputed facts, and summary judgment must be denied at this time.

At oral argument, Manpower raised an argument that touches upon the separate issue of causation under the claim of negligent provision of security. Manpower's counsel noted that the Manpower employee that served as hall monitor was not the employee at the table at the time Mickiewicz entered the bathroom. This ground for summary judgment was not squarely presented in Manpower's summary judgment papers, and it would not be appropriate for me to make a ruling on this question without adequate notice to the other parties. Accordingly, my denial of Manpower's motion for summary judgment is without prejudice with respect to this claim.

In all other respects, Manpower's motion for summary judgment is denied.

### E. Indemnity and Contribution Between the Defendants

Transcore seeks a ruling that it is not required to indemnify Paino Associates because the damages were caused, at least in

part, by Paino Associates' negligence. The lease provisions each contain an exception for damage caused by the landlord's own negligence. Paino Associates asserts that the burden is on Transcore to establish that these exceptions apply, and that they have not produced evidence of Paino Associates' negligence. Transcore argues to the contrary that Paino Associates did not take reasonable steps to provide security.

 Under Massachusetts law, "[c]ontracts of indemnity are to be fairly and reasonably construed in order to ascertain the intention of the parties and to effectuate the purpose sought to be accomplished." *Shea v. Bay State Gas Co.,* 383 Mass. 218, 222, 418 N.E.2d 597 (1981) (citations and quotation marks omitted). One exception to that general rule is that landlords cannot, by contract, transfer the risk of loss due to the landlord's negligence to the tenant. Mass. Gen. Laws ch. 186, § 15. Such a lease term, whether in a commercial or a residential lease, is void in its entirety. *See Finley v. Gateway Self-Storage of Massachusetts, Inc.,* 57 Mass. App.Ct. 1102, 780 N.E.2d 970 (2003) (table); *see also Young v. Garwacki,* 380 Mass. 162, 171 n. 12, 402 N.E.2d 1045 (1980) (in dicta); *Knous v. Mehrez,* 10 Mass. L. Rptr. 47 (Mass,Super.1999).

The lease in this case does not suffer from that defect. The provision requiring the tenant to indemnify the landlord expressly excludes the damage or loss caused by the landlord's own negligence. (*See* Bacon Aff., Docket No. 110, Exh. 3, as quoted above in Part III.A.4) Whether this exclusion applies in this case depends upon a finding by the jury of whether or not Paino Associates was negligent.

 Transcore also suggests, in a footnote, that the provision in the lease requiring Transcore to carry liability insurance naming the landlord as an insured also runs afoul of Mass. Gen. Laws. ch.

186, § 15, because it requires the tenant to indemnify the landlord for the landlord's own negligence. Paino Associates, however, has disclaimed such a construction of this clause. (*See* Paino Associates' Opp., Docket No. 123, at 18) Massachusetts law requires that a contract indemnifying one's own negligence must use unequivocal language. *See Laskowski v. Manning,* 325 Mass. 393, 398–99, 91 N.E.2d 231 (1950). Courts in other jurisdictions have maintained the distinction between contractual terms obligating one party to carry insurance for the benefit of another and contractual terms for indemnification. *See, e.g., Olympic, Inc. v. Providence Washington Ins. Co.,* 648 P.2d 1008, 1011 (Alaska 1982). Transcore has not mustered any support for the proposition that Massachusetts courts would muddle this distinction. Massachusetts courts routinely enforce covenants in leases requiring the tenant to carry liability insurance naming the landlord as an insured. *See, e.g., Parkway Corp. v. Clark Equipment Co.,* 9 Mass. App.Ct. 878, 401 N.E.2d 879 (1980); *Evans v. Sack,* 320 Mass. 84, 67 N.E.2d 758 (1946); *Richmond v. Kelsey,* 225 Mass. 209, 114 N.E. 319 (1916). I conclude that Massachusetts courts would not construe this clause as one calling for indemnification of the landlord's own negligence.

Accordingly, Transcore's motion for summary judgment must be denied on this ground.

Finally, I will consider the defendants' cross-claims for contribution. Under the Massachusetts joint tortfeasor statute, any joint tortfeasor who has paid more than their pro rata share of a judgment is entitled to seek contribution from the other joint tortfeasors. *See* Mass. Gen. Laws ch. 231B, §§ 1–4 (2004). Whether this provision applies depends upon whether a particular defendant has been found to be a joint tortfeasor.

■ I conclude that a disputed question of fact exists with respect to whether each of the defendants is subject to joint liability. Paino Associates and Transcore were both involved in handling security at the office building. Manpower employees were used at the security table. Transcore and Manpower were both involved in the supervision of Mickiewicz. The jury could find that one or more of the parties were negligent and that some of the other parties are jointly liable on this theory. Until this court has the factual findings of the jury on the question of negligence, this court cannot make any determination about rights of contribution.

Accordingly, I will deny the motions for summary judgment on this ground.

## F. Alleged Fraudulent Claims By the Insured

Transcore alleges that the tenants, whose rights are subrogated to the plaintiff insurers, presented those insurers with fraudulent claims. Just as fraudulent misrepresentations made by the insured to the insurer during the application for insurance can negate coverage completely, Transcore argues that fraudulent misrepresentations made during the claims process should void recovery by the plaintiff insurers here. Transcore then attempts to demonstrate that some of the claims made by the tenants to the insurers were fraudulent. The plaintiff insurers question the legal grounding for this theory and offer evidence refuting the assertion that the claims were fraudulent.

Transcore's argument is a novel one. The cases that have been cited in support merely stand for the familiar rule that fraudulent misrepresentations on an insurance *application* may be grounds for an insurance company to avoid coverage, *see Boston Mut. Ins. Co. v. New York Islanders Hockey Club, L.P.*, 165 F.3d 93, 96 (1st Cir.1999) (citing Mass. Gen. Laws ch. 175,

§ 186); *Northwestern Mut. Life Ins. Co. v. Iannacchino*, 950 F.Supp. 28, 31 (D.Mass. 1997), or that fraudulent misrepresentations may constitute a breach of a cooperation clause, *see Jertson v. Hartley*, 342 Mass. 597, 602, 174 N.E.2d 663 (1961). None of these cases stand for the proposition Transcore advances, and Transcore has not identified any other authority for such a rule.

■ The defendants' novel legal theory can be rejected by reference to basic principles of insurance law. A subrogated insurer "stands in the shoes" of the insured with respect to claims brought against the alleged tortfeasor. *Liberty Mut. Ins. Co. v. National Consolidated Warehouses, Inc.*, 34 Mass.App.Ct. 293, 297, 609 N.E.2d 1243 (1993). Within this analytic framework, the defendants' claim that fraudulent claims should negate coverage does not make sense. Essentially, the defendants' claim is that the plaintiffs are deceiving themselves. The law has a simple remedy when the defendants argue that the plaintiffs are deceiving themselves with respect to the amount of damage claimed: the jury decides the amount of damage the plaintiffs actually suffered.

■ The equitable considerations invoked by Transcore also do not compel the ruling the defendants suggest. A subrogated insurer is not always entitled to recover the amount paid to the insured. *See Home Owners' Loan Corp. v. Baker*, 299 Mass. 158, 162, 12 N.E.2d 199 (1937). The subrogated insurer may be limited to recovering only the actual amount of damage suffered by its insured. *See Harvard Trust Co. v. Racheotes*, 337 Mass. 73, 76–77, 147 N.E.2d 817 (1958). Therefore, the insurer itself is the only party injured when the insured presents fraudulent claims that the insurer pays. Transcore's argument is unsupported by existing law

and is not compelled by any other equitable considerations.

Accordingly, I will deny Transcore's motion for summary judgment on these grounds.

## IV. Motion to Strike

During the hearing on March 24, 2005, defendant Transcore orally raised a motion to strike certain exhibits submitted by the plaintiffs in support of their opposition to the summary judgment motions. Transcore objected to opinions presented in the expert report by Miller and certain statements contained within that report, primarily on the grounds that the report was not sworn to or in the form of an affidavit and therefore was not competent evidence for summary judgment purposes. The plaintiffs responded by offering to cure any defects within a short time period. I stated that I would not make a ruling on the bench on any of these procedural defects because it would only lead to disagreement later.

■■■ "The failure to authenticate a document properly precludes its consideration on a motion for summary judgment." *Robinson v. Bodoff*, 355 F.Supp.2d 578, 582 (D.Mass.2005) (striking all exhibits that were submitted without affidavits and were not self-authenticating). Motions for summary judgment may be supported by "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ...." Fed.R.Civ.P. 56(c); *see Robinson*, 355 F.Supp.2d at 582. "To be admissible [at the summary judgment stage], documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) ...." 10A Wright, Miller & Kane, *Federal Practice & Procedure* § 2722 (3d ed.1998) (quoted in *Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir.2000)). The expert reports in this case, submitted without an authenticating affidavit, would ordinarily be stricken.

As I explained to counsel during the hearing, this motion to strike, raised during oral argument at the hearing on summary judgment, is a procedural gimmick designed to gain some sort of tactical advantage over opposing counsel. I will not allow such a procedural gimmick to prevent an adjudication *on the merits*, but in the ordinary course will allow a party a reasonable opportunity to fix procedural mistakes. In these circumstances, however, allowing such an opportunity is unnecessary. The plaintiff has adduced sufficient evidence to defeat Transcore's motion for summary judgment even without the expert report, as discussed in Part III.B, above, and accordingly I will deny Transcore's oral motion to strike as moot.

## ORDER

For the foregoing reasons, it is ORDERED:

(1) Defendant Paino's Motion for Partial Summary Judgment Against Third–Party Defendant Massachusetts Turnpike Authority (Docket No. 83) was WITHDRAWN at the hearing on March 24, 2005.

(2) Defendant Paino's Motion for Partial Summary Judgment Against Third–Party Defendant Massachusetts Turnpike Authority (Docket No. 84) was WITHDRAWN at the hearing on March 24, 2005.

(3) Defendant Paino's Motion for Summary Judgment Against Plaintiff Great Northern (Docket No. 85) was WITHDRAWN at the hearing on March 24, 2005.

(4) Cross–Motion of Defendant, Massachusetts Turnpike Authority, for Summary Judgment Against Paino Associates (Docket No. 94) was WITHDRAWN at the hearing on March 24, 2005.

(5) Motion of Defendant, Massachusetts Turnpike Authority, for Summary Judgment Against Plaintiffs, Great Northern Insurance Company, CNA Commercial Insurance Company and National Grange Mutual Insurance Company (Docket No. 100) was WITHDRAWN at the hearing on March 24, 2005.

(6) Defendant Transcore, Inc.'s Motion for Summary Judgment Against the Plaintiffs (Docket No. 105) is DENIED.

(7) Third–Party Defendant Transcore, Inc.'s Motion for Summary Judgment Against Third–Party Plaintiff Paino Associates (Docket No. 108) is DENIED.

(8) Joint Motion to Modify Scheduling Order By One Week (Docket No. 109) is ALLOWED.

(9) Motion for Summary Judgment in Favor of Fourth–Party Defendant Manpower, Inc. (and Request for Oral Argument) (Docket No. 112) is DENIED as described in Part III.D, above.

(10) Motion of Third–Party Defendant Massachusetts Turnpike Authority to Continue Hearing on Motions Scheduled for March 24, 2005 (Docket No. 133) is ALLOWED.

(11) Transcore's oral motion to strike, raised during the hearing on March 24, 2005, is DENIED as moot.